IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CR-108-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| JENNIFER LEA MORGAN, | ) | |
| | ) | |
| Defendant. | ) | |

On May 3, 2016, a federal grand jury indicted Jennifer Lea Morgan ("Morgan") and charged her with one count of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 [D.E. 6]. On August 15, 2016, Morgan moved to suppress evidence recovered from her car on June 3, 2013, and statements that she made to the police on and after June 3, 2013 [D.E. 22]. Morgan also filed a memorandum in support of her motion to suppress [D.E. 23]. On August 29, 2016, the government responded in opposition [D.E. 24]. On September 19, 2016, Morgan replied [D.E. 29]. On November 4, 2016, the court held a hearing on the motion to suppress. As explained below, the court denies the motion to suppress.

I.

On April 22, 2013, an FBI task force, including Agent Keith McKenna ("Agent McKenna"), obtained an order authorizing a Title III wiretap of a phone number belonging to Andrew Walters ("Walters") based on evidence that Walters was dealing cocaine. The wiretap of Walters's phone intercepted numerous conversations between Walters and Morgan and led the task force to conduct surveillance of the pair. See Govt. Exs. 1–7. In their conversations, Morgan would request "seven" or "fourteen" from Walters. The court credits the testimony of Agent McKenna that, based on his training and experience, he understood the terms "seven" and "fourteen" to refer to quantities of

cocaine.[1] As a result of the recorded conversations and surveillance, Agent McKenna believed that Walters was conspiring with Morgan to distribute cocaine. Specifically, in a conversation on April 29, 2013, Walters asked Morgan if she wanted "the same or short less," and Morgan replied that "fourteen[']s good." See Govt. Ex. 1. On May 2, 2013, Morgan "call[ed] to see if [Walters] ha[d] [fourteen]"; Walters replied that he did, and the two agreed to meet at a shopping center. See Govt. Ex. 2. On May 8, 2013, Morgan asked if Walters "had seven that I could grab from you," to which Walters replied that he did, but that Morgan would have to call a third party because Walters "ain[']t been moving around like that lately." See Govt. Ex. 3. On May 14, 2013, Walters offered Morgan "a sample of . . . some sheets of glass . . . she's scaled up, shiny flaky, everything cool. Ain't like the normal way." See Govt. Ex. 4. Walters said he had only "a 'hemi'" or "fourteen," of the sample, and the two agreed to meet. See id. On May 15, 2013, Morgan and Walters discussed meeting, and Morgan said that she would "probably do [fourteen]." See Govt. Ex. 5. On May 20, 2013, Morgan asked Walters to "swing by here and bring me [seven]," and Walters agreed. See Govt. Ex. 6. On May 23, 2013, Morgan called Walters "to see if you are around I'll take another [seven] and I will have that other money for you." See Govt. Ex. 7. Walters said Morgan would probably have to meet a third party, and Morgan agreed. Id. On June 1, 2013, Morgan called to ask for "another seven whenever you're ready." See Govt. Ex. 8.

On June 3, 2013, at about 5:30 pm, Morgan told Walters that she would be at a Hurricane Grill and Wings restaurant in Cary and that she would "take another seven." See Govt. Ex. 9. At about 6:45 pm, Morgan told Walters that she "left the . . . money in my cup holder if you just want to drop it off in the car." See Govt. Ex. 10. Walters agreed, and Morgan told Walters where she had

---

[1] "Seven" and "fourteen" refer to the amount of cocaine in grams, roughly converting to a quarter and half of an ounce respectively. During the recorded conversations, Morgan and Walters refer interchangeably to "fourteen" and a "hemi" or half-ounce. See Ex. 4.

parked her car. Id. Law enforcement set up surveillance of the restaurant's parking lot and observed Walters briefly entering and then exiting Morgan's car. See Govt. Exs. 14–15. At about 7:10 pm, after Walters had briefly entered and then exited Morgan's car, Walters called Morgan to say that he had forgotten to lock Morgan's car door. See Govt. Ex. 11. Morgan then left the restaurant, got in her car, and drove away. See Govt. Exs. 16–17. Agent McKenna contacted members of the Cary Police Department, informed them that Morgan had just purchased cocaine, and instructed them to stop her car. See [D.E. 24-1].

At 7:19 pm, Officer Doug Williams of the Cary Police Department stopped Morgan's car for unsafe speed in inclement weather. See [D.E. 24-1] 7. At 7:22 pm, Officer Hillary Dieckmann of the Cary Police Department pulled up in her patrol car and joined Officer Williams.[2] Unbeknownst to Officer Williams or Agent McKenna, Officer Dieckmann had a personal, social relationship with Morgan. Officer Dieckmann told Officer Williams that she would speak to Morgan because the two had a "rapport." Officer Dieckmann approached Morgan's car, and the two briefly discussed why Williams had stopped Morgan. Officer Dieckmann stated that she did not know why Officer Williams stopped Morgan. The two then engaged in casual, friendly conversation about personal matters. At 7:33 pm, Officer Dieckmann left Morgan's vehicle and spoke to Officer Williams, asking if he had seen Morgan throw anything out of her car window, to which Officer Williams replied that he was unsure. At 7:35 pm, the officers spoke to Agent McKenna, who suggested Morgan might have tossed the drugs out of her car window, but also suggested that the officers check to see if the drugs were on Morgan's person.

At 7:38 pm, the officers returned to Morgan's car, asked Morgan to step out of her car, and

---

[2] The times are taken from the dash video recording of Officer Dieckmann's patrol car. See [D.E. 23].

told her that the car had been flagged in high-crime area. At 7:40 pm, Officer Williams asked for consent to search Morgan's car, and for Officer Dieckmann to search Morgan's person for weapons. Morgan consented to both searches. Officer Dieckmann performed a patdown search of Morgan's person and discovered no weapons or contraband. Officer Williams searched Morgan's car for about 18 minutes, including a search of the car's cabin and trunk, but did not locate any contraband. After Officer Dieckmann finished patting down Morgan, Morgan leaned against a guard rail and the two discussed personal matters. After Officer Williams finished searching the car, Morgan then got back in her car. Officers Dieckmann and Williams returned to Williams's patrol car and Dieckmann spoke to Agent McKenna, who confirmed that the drug transaction had definitely occurred. The two officers reviewed Officer Williams's dash video recording to see whether Morgan had thrown any drugs from her window, but they could not determine from Officer Williams's dash video recording whether Morgan had done so.[3]

At 8:04 pm, the officers again approached Morgan's car. They told Morgan that someone had seen Morgan throw something out of her car window and that a K-9 drug detection unit was on its way. Neither statement was true. Morgan continued to deny that she had any drugs or had thrown anything out of her car window. At 8:14 pm, the officers requested a K-9 unit, but were ultimately told that none were available.

At 8:24 pm, Officer Dieckmann returned to speak with Morgan. Officer Dieckmann said that Officer Williams had reviewed his dash video recording and saw something thrown from Morgan's car and that a citizen had reported seeing something thrown from her car. Neither statement was true. Using phrases like "I'm just trying to help you out, I know you," and "you know me, girl,"

---

[3] When the officers viewed the dash video recording from Officer Williams's patrol car, the dash video apparently stopped recording. Thus, the record does not contain a dash video recording from Officer Williams's patrol car.

4

Officer Dieckmann attempted to persuade Morgan to confess to possessing drugs and said that police would be searching the area where the citizen had reported that something had been thrown "no matter what." Officer Dieckmann reassured Morgan, stating "I'm just trying to help you, I don't want to see you get hemmed up on anything." During that conversation, at 8:26 pm, Morgan asked "so am I going to jail?" Officer Dieckmann responded "I mean, we ain't taking you to jail for nothing," and that if the search turned up no evidence of drugs, Morgan would be "free to go." Officer Dieckmann went on, saying "you know you can tell me anything, and you know I'm going to work with you . . . I'm trying to help you out, if there's anything you want to tell me. . . . You know you can talk to me." Morgan denied any wrongdoing, suggested that the citizen was mistaken, and insisted that she had not thrown anything out of her car window. Morgan also stated that she had allowed a friend to borrow her car. Officer Dieckmann asked if the borrower had possibly hidden drugs in the car. Morgan replied that she did not know for sure.

At 8:33 pm, as Officer Dieckmann urged Morgan to reveal more information, Morgan admitted: "I have a gram of coke . . . . and I just put it in the water bottle." Officer Dieckmann took the water bottle, told Morgan that a drug-sniffing dog would identify the presence of cocaine, and asked Morgan if she would come talk to her in the police station to discuss the case. Morgan agreed and admitted to swallowing the plastic baggie that had held the cocaine. Officer Dieckmann asked if Morgan needed medical assistance due to swallowing the plastic baggie. Morgan said no. Officer Dieckmann then said, "I'm going to do my best to work with you . . . . I don't want, listen, as long as you're cooperative, I don't want to take you . . . ." Officer Dieckmann reassured Morgan that the two would talk at the police station and that Officer Williams would not be there. Officer Dieckmann then returned to her patrol car and told Agent McKenna that Morgan had dumped the cocaine in the water bottle. Officer Dieckmann suggested that there might have been more than a

5

gram of cocaine because the water was "extremely cloudy." At 8:42 pm, Officer Dieckmann returned to Morgan and told her that she would give Morgan a ride to the police station to discuss the case and that Officer Williams would move Morgan's car to a safe location. Morgan agreed, and Officer Dieckmann handcuffed Morgan. At 8:44 pm, as Morgan was getting into Officer Dieckmann's patrol car, Officer Dieckmann told Morgan:

> this is all going to be fine, and what I did is I called one of our detectives who I know really well, he's really cool, and I said look, I don't want this girl to go to jail, she's going to come in and I'm going to be with you the whole time and we're just going to talk and you work with us, you ain't going to jail, okay?

With Morgan handcuffed in the backseat of Officer Dieckmann's patrol car, Officer Dieckmann drove Morgan to a police station. During the trip, Morgan said, without prompting, that "if this had to happen," she was glad Officer Dieckmann had been present. Officer Dieckmann responded that she could not hear Morgan from the back seat and that the two should talk once they reached the police station. Morgan complained that she was uncomfortable and stated, without prompting, that "I did not throw a fucking thing out the window," to which Officer Dieckmann replied that "it's going to be alright." Morgan expressed relief that Officer Dieckmann had come to the scene because Morgan thought Officer Williams was prepared to take her to jail. Near the end of the car ride to the station, Morgan commented that the car ride had taken a long time due to traffic and apologized for disrupting Officer Dieckmann's dinner plans.

At the police station, agents gave Morgan her Miranda warnings, and Morgan waived her rights to silence and counsel. Agent McKenna then interviewed Morgan with Officer Dieckmann present. Agent McKenna informed Morgan that she faced a serious felony charge for possession of cocaine, but that she could try to "help herself out" by talking with the police. Agent McKenna also told Morgan that if "she helped them out," they would "try to help her out," but Agent McKenna

6

made no explicit promises. During the interview, Morgan admitted to repeatedly purchasing cocaine from Walters and agreed to actively cooperate. At approximately 12:17 am on June 4, 2013, Morgan placed a recorded telephone call to Walters about purchasing cocaine.

The officers did not arrest Morgan on either June 3 or 4, 2013. Instead, Morgan went home on June 4, 2013, after making the recorded call to Walters. Over the next six months, Morgan continued to cooperate, to be debriefed, and to act as a confidential informant.

In December 2013, Morgan received a target letter. On May 3, 2016, a federal grand jury indicted Morgan. Morgan now asks the court to suppress the cocaine found in her car and all statements that she made to the police on and after June 3, 2013.

II.

Morgan argues that her seizure on June 3, 2013, violated the Fourth Amendment. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "touchstone" of analysis "under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Pennsylvania v. Mimms, 434 U.S. 106, 108–09 (1977) (per curiam) (quotation omitted). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809–10 (1996). Thus, when the police stopped Morgan's car on June 3, 2013, the police seized her. See id.; Brendlin v. California, 551 U.S. 249, 254–56 (2007).

An automobile stop is a reasonable seizure if "the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810. Probable cause that a traffic violation has occurred "exists if, given the totality of the circumstances, the officer had reasonably trustworthy

7

information sufficient to warrant a prudent person in believing that the [seized person] had committed or was committing an offense." United States v. Sowards, 690 F.3d 583, 588 (4th Cir. 2012) (alterations and quotation omitted). "Because a traffic stop is more analogous to an investigative detention than a custodial arrest," a court analyzes the validity of a traffic stop by asking if the stop "was justified at its inception" and if "the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011) (quotation omitted); see Illinois v. Caballes, 543 U.S. 405, 407–09 (2005).

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). During a traffic stop, an officer may order the driver to get out of the car. See, e.g., Mimms, 434 U.S. at 108–11. An officer may extend a traffic stop if the officer has "reasonable suspicion of a serious crime." United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000) (en banc) (quotation omitted). An officer has reasonable suspicion of a crime if the officer can point to specific articulable facts that suggest criminal activity. The officer need not have probable cause. See Illinois v. Wardlow, 528 U.S. 119, 123–24 (2000). "[W]hen an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer." United States v. Massenburg, 654 F.3d 480, 492 (4th Cir. 2011); see United States v. Hensley, 469 U.S. 221, 223, 232 (1985); Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971); United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996); United States v. Laughman, 618 F.2d 1067, 1072–73 (4th Cir. 1980).

The seizure that led to Morgan's statements and the discovery of her cocaine began as a

8

traffic stop justified by probable cause for unsafe speed in inclement weather. The officers then extended the seizure based on probable cause—possessed and relayed by Agent McKenna—that Morgan had just committed the crimes of possessing cocaine with intent to distribute and conspiring to possess cocaine with intent to distribute. See 21 U.S.C. §§ 841(a)(1), 846. Although Morgan suggests that Officers Williams and Dieckmann gave Morgan inconsistent justifications for the stop, the court finds that Officer Williams observed Morgan driving at an unsafe speed in inclement weather before Officer Williams stopped her. See, e.g., [D.E. 24-1] 7; United States v. Williams, 740 F.3d 308, 312 (4th Cir. 2014) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle. Moreover, an officer who observes a traffic offense may have probable cause even where he has additional motives for the stop." (quotation and citation omitted)).

The police officers then permissibly extended the stop based on Agent McKenna's probable cause to believe that Morgan had just committed the crimes of possessing cocaine with intent to distribute and conspiring to possess cocaine with intent to distribute. The facts that justified Morgan's continued detention beyond the time needed to clear the traffic violation were the recorded conversations in which Morgan seemingly set up numerous cocaine buys from her drug supplier Walters, the particular phone calls setting up a drug transaction on June 3, 2013, which involved Walters placing the cocaine in Morgan's unlocked car, surveillance video showing Walters quickly entering and exiting Morgan's unlocked car, and a confirmatory phone call from Walters to Morgan on June 3, 2013, after he apparently put the cocaine in her car. See Govt. Exs. 1–14. Therefore, Morgan's traffic stop was reasonable at its inception based on probable cause to believe she committed a traffic offense, and the officers reasonably extended the stop based on information relayed by Agent McKenna to Officers Williams and Dieckmann that Morgan had just committed

9

the crimes of possessing cocaine with intent to distribute and conspiring to possess cocaine with intent to distribute. See, e.g., Hensley, 469 U.S. at 223, 232; Whiteley, 401 U.S. at 568; Massenburg, 654 F.3d at 492.

Alternatively, even if Officer Williams lacked probable cause for a traffic stop based on unsafe speed in inclement weather, Officer Williams was justified in stopping Morgan because Agent McKenna had probable cause to believe that Morgan had just committed two felonies at the restaurant, namely possession of cocaine with intent to distribute and conspiracy to possess cocaine with intent to distribute. See 21 U.S.C. §§ 841(a)(1), 846. The Fourth Amendment permits a warrantless arrest "in a public place for a felony, or a misdemeanor, committed in the officer's presence . . . if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003); see United States v. Watson, 423 U.S. 411, 418 (1976) ("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest."); Figg v. Schroeder, 312 F.3d 625, 636 (4th Cir. 2002) (an officer also may arrest a person in a public place if the officer has probable cause to believe "that the arrestee had committed . . . a crime"). Probable cause poses a "practical, nontechnical" question that requires a court to ask if police had "a reasonable ground for belief of guilt . . . particularized with respect to the person to be searched or seized." Pringle, 540 U.S. at 370–71 (citations omitted); Ornelas v. United States, 517 U.S. 690, 695–97 (1996); United States v. Sokolow, 490 U.S. 1, 7 (1989); Illinois v. Gates, 462 U.S. 213, 231–32 (1983); Figg, 312 F.3d at 636–37. If police officers have probable cause that would justify arresting a suspect, they "d[o] not violate the Fourth Amendment by detaining [the suspect] for a few hours." Figg, 312 F.3d at 637.

Officer Williams, who stopped Morgan at Agent McKenna's direction, had probable cause to believe that Morgan was guilty of possession of cocaine with intent to distribute and conspiracy to possess cocaine with intent to distribute based the recorded conversations in which Morgan seemingly set up numerous cocaine buys from Walters, a known drug dealer, the particular phone calls setting up a drug transaction on June 3, 2013, which involved Walters placing the cocaine in Morgan's unlocked car, surveillance video showing Walters quickly entering and exiting Morgan's unlocked car, and a confirmatory phone call from Walters to Morgan on June 3, 2013. See Govt. Exs. 1–14. Agent McKenna relayed this information to Officers Williams and Dieckmann, and they could rely on the information. See, e.g., Hensley, 469 U.S. at 223, 232; Whiteley, 401 U.S. at 568; Massenburg, 654 F.3d at 492. Thus, the officers had probable cause to seize Morgan. See, e.g., Pringle, 540 U.S. at 370–74; Sokolow, 490 U.S. at 7; Gates, 462 U.S. at 231–32. Indeed, at oral argument on the motion to suppress, Morgan conceded that the task-force officers had probable cause to arrest Morgan on felony drug charges before Morgan ever left the restaurant's parking lot. Here, the officers did not violate Morgan's rights under the Fourth Amendment by seizing Morgan for 75 minutes while they spoke with her, conducted a consensual patdown of her, conducted a consensual search of her vehicle, and investigated the case. See, e.g., Figg, 312 F.3d at 637.

In opposition, Morgan argues that even if the officers had probable cause to believe that Morgan possessed cocaine with intent to distribute and conspired to possess cocaine with intent to distribute when she was at the restaurant and at the stop's inception, once Officers Dieckmann and Williams questioned Morgan, patted her down, and performed an 18-minute search of Morgan's car without finding any cocaine, probable cause disappeared. The court assumes without deciding that new information, viewed under the totality of the circumstances, may sometimes make probable cause disappear. Cf. Peet v. City of Detroit, 502 F.3d 557, 565 (6th Cir. 2007) (holding that police

were not obligated to release an arrested suspect after new evidence allegedly disproved probable cause because "[s]uch a rule would give investigators the responsibility to reevaluate probable cause constantly with every additional witness interview and scrap of evidence collected"). In this case, however, probable cause did not disappear.

In reaching this conclusion, the court finds United States v. Hernandez-Mendoza, 600 F.3d 971, 975–76 (8th Cir. 2010), instructive. In Hernandez-Mendoza, the Eighth Circuit held that, based on the totality of the circumstances, probable cause to believe that drugs were in a vehicle did not dissipate even after two searches of the vehicle earlier the same day—an hour-long roadside search and a second search at a police patrol garage—failed to uncover drugs. Id. at 976. The Eighth Circuit held that "[p]robable cause to search a vehicle [did] not dissipate simply because it [took] a long time to complete a reasonable and thorough search." Id. Likewise, here, probable cause did not disappear merely because Officer Williams performed an 18-minute, roadside, consensual search of Morgan's car and did not discover cocaine. The same conclusion holds true even though Officer Dieckmann's consensual patdown of Morgan also did not yield cocaine. In reaching this conclusion, the court relies on all of the other evidence that the task force had gathered that provided probable cause to believe that Morgan had just committed two felonies. See, e.g., Govt. Exs. 1–14; Pringle, 540 U.S. at 370–74; cf. Dunaway v. New York, 442 U.S. 200, 207–16 (1979) (holding that even if no formal arrest is made, the police must have probable cause to seize a suspect, transport the suspect to the police station, and detain the suspect for interrogation); see also Michigan v. Summers, 452 U.S. 692, 696–97 (1981).

In response, Morgan cites United States v. Babwah, 972 F.2d 30 (2d Cir. 1992), and argues that probable cause disappeared after Officers Dieckmann and Williams's initial investigation failed to produce a confession or to reveal the presence of cocaine on Morgan or in her car. In Babwah,

12

the Second Circuit considered a Terry investigative seizure that was not supported by probable cause. Id. at 33. Specifically, in Babwah law enforcement officers had a "reasonable articulable suspicion that" the car Babwah was driving and the luggage in the car "contained currency connected to an ongoing money-laundering investigation." Id. at 32–33. The law enforcement officers stopped the car containing Babwah and his companion Agreda. Id. at 32. Agreda, the owner of the luggage, consented to a search of the luggage, and Babwah consented to a search of the car. Id. Neither search revealed anything incriminating. Id. at 33. The officers, however, continued to detain Babwah after the search and drove Babwah to a residence that they believed was connected to a money-laundering ring. Id. at 32–33. Only after officers drove Babwah to this second location did Babwah consent to a search of the residence and make incriminating statements that provided probable cause to believe that currency found in the residence was contraband. Id. at 33–34. The Second Circuit held that the evidence seized at the residence should have been suppressed. Id. at 34. The Second Circuit reached this conclusion because extending Babwah's seizure beyond the point when the officers' reasonable "suspicions concerning contraband proved unfounded" rendered Babwah's continued seizure unlawful, thus tainting his consent. Id. at 33–34.

Babwah does not help Morgan. Unlike in Babwah, the officers in this case had probable cause to arrest Morgan for two felonies from the stop's inception, which justified a greater intrusion on Morgan's liberty and privacy. See, e.g., Atwater v. City of Lago Vista, 532 U.S. 318, 354–55 (2001); Whren, 517 U.S. at 817–18; Dunaway, 442 U.S. at 216. Moreover, seven to fourteen grams of cocaine takes up relatively little space, and "[i]t is well established, and well known, that drug traffickers have developed sophisticated means to secrete contraband in vehicles." Hernandez-Mendoza, 600 F.3d at 976. That the consensual patdown of Morgan or the 18-minute, consensual, roadside search of Morgan's vehicle for drugs did not yield contraband does not mean that the

13

officers' "suspicions concerning contraband proved unfounded" as in <u>Babwah</u>. Rather, in light of the totality of the evidence known to the officers, the officers' failure to discover the cocaine during the consensual patdown or during the 18-minute, consensual, roadside search did not make probable cause disappear.

Morgan also cites discussions between Officers Williams and Dieckmann in which Officer Williams allegedly stated that Morgan may have thrown the drugs out of her car window. Morgan then argues that Officer Williams's statement shows that his suspicion of drugs in the car had disappeared. The evidence concerning Officer Williams's belief is, in fact, equivocal. After Officers Williams and Dieckmann reviewed the dashboard video recording in Officer Williams's patrol car, they could not tell whether Morgan had thrown something out of her car window. In any event, even assuming the officers subjectively believed that Morgan threw the cocaine out the window, that subjective belief would not negate probable cause in this case. <u>Cf. Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004); <u>Whren</u>, 517 U.S. at 812–14. Even if Morgan did throw the cocaine out of the window, that fact would not negate probable cause as to possession of cocaine from the time Morgan got into her car at the restaurant until allegedly throwing the cocaine out of the window. Furthermore, information tending to disprove probable cause concerning the conspiracy charge would not necessarily be found in Morgan's car. "[T]he inchoate crime of conspiracy punishes the agreement to commit an unlawful act, not the completion of the act itself." <u>United States v. Min</u>, 704 F.3d 314, 321 (4th Cir. 2013). "In order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy." <u>United States v. Shabani</u>, 513 U.S. 10, 15 (1994). If the officers never found any cocaine in Morgan's car, Morgan's voice was still on the recorded phone calls seeming to agree to numerous drug transactions. When this evidence is coupled with the officers' observations of Walters and

Morgan's conversations and their conduct at the restaurant on June 3, 2013, probable cause did not disappear even if the officers did not believe cocaine remained in Morgan's car on the evening of June 3, 2013.

When police officers have probable cause to arrest a person for a felony, police officers may detain the person "for a few hours" and use other investigative techniques to investigate the felony. See Figg, 312 F.3d at 637. Here, based on facts relayed to the officers by Agent McKenna, the officers had probable cause to believe that Morgan had conspired to possess cocaine with intent to distribute, had actually possessed cocaine, and had just participated in a drug purchase. See Govt. Exs. 1–14. The fact that the consensual patdown of Morgan or the 18-minute, roadside, consensual search of Morgan's car did not reveal the presence of drugs did not meaningfully change the totality of the circumstances or alter the probable cause to believe that Morgan had conspired to possess cocaine with intent to distribute and had possessed cocaine with intent to distribute. See, e.g., Pringle, 540 U.S. at 370–74; Sokolow, 490 U.S. at 7; Gates, 462 U.S. at 231–32; Hernandez-Mendoza, 600 F.3d at 975–76. Thus, even after Officer Dieckmann's patdown of Morgan and Officer Williams's 18-minute search, the officers acted reasonably when they continued to detain Morgan for a total of 75 minutes and investigated further. See, e.g., United States v. Ross, 456 U.S. 798, 799–800, 825 (1982); Cupp v. Murphy, 412 U.S. 291, 296 (1973); Hernandez-Mendoza, 600 F.3d at 975–76; Figg, 312 F.3d at 637.

At the suppression hearing, Morgan also argued that her seizure was unreasonable under a balancing test. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653–57 (1979); United States v. Brignoni-Ponce, 422 U.S. 873, 889–84 (1975). The officers' seizure of Morgan, however, was justified by probable cause to believe that Morgan had just committed at least two felonies. "Where probable cause has existed, the only cases in which [the Supreme Court has] found it necessary

15

actually to perform the balancing analysis involved searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests," such as a seizure via deadly force or a warrantless entry into a home. Whren, 517 U.S. at 818; see Atwater, 532 U.S. at 354–55. The traffic stop at issue in this case "does not remotely qualify as such an extreme practice." Whren, 517 U.S. at 818; see Atwater, 532 U.S. at 354–55. Here, the officers detained Morgan for 75 minutes, based on probable cause to believe that she had just committed two felonies, during which time Morgan was not handcuffed, physically restrained, physically harmed, threatened, or otherwise subject to an "extraordinary" seizure or search. See, e.g., Atwater, 532 U.S. at 354–55; Whren, 517 U.S. at 818. Therefore, the balancing test does not apply. See Atwater, 532 U.S. at 354–55; Whren, 517 U.S. at 818.[4]

Finally, Morgan argues that the court should hold that her seizure became unreasonable because she was detained for 75 minutes before she was arrested. Specifically, Morgan argues that allowing a 75-minute pre-arrest detention would permit law enforcement to skirt the requirement that a probable cause hearing generally be held within 48 hours of a warrantless arrest. See Cty. of

_____

[4] Even if the balancing test applies, the 75-minute seizure was not unreasonable. The officers had a pressing need to determine whether Morgan had cocaine on her person or in her car or whether she had thrown cocaine out of her car window. The seizure at issue was reasonable as to time and scope. See, e.g., Illinois v. McArthur, 531 U.S. 326, 331–34, 337 (2001). First, the officers had probable cause to believe that Morgan had just committed two felonies and that evidence of those felonies would be on her person, in her car, or on the route on which her car had traveled from the restaurant. Second, the "officer[s] imposed the restraint for a limited period of time, namely, [75 minutes]." Id. at 332; cf. United States v. Place, 462 U.S. 696, 709 (1983) (declining to "adopt any outside time limitation for a permissible Terry stop," but invalidating a Terry stop that lasted 90 minutes "on the facts presented by this case"). The 75-minute time period in this case was reasonably necessary to investigate the matter, and the officers acted diligently during the stop. See, e.g., McArthur, 531 U.S. at 332; Hernandez-Mendoza, 600 F.3d at 975–76; Figg, 312 F.3d at 637. Third, the officers acted reasonably towards Morgan during the stop and ensuing investigation. The officers did not handcuff her, restrain her, harm her, threaten her, or direct any other extraordinary conduct towards her.

16

<u>Riverside v. McLaughlin</u>, 500 U.S. 44, 54–59 (1991); <u>Gerstein v. Pugh</u>, 420 U.S. 103, 120–26 (1975).

The court rejects the argument. <u>McLaughlin</u> and <u>Gerstein</u> do not place a time limit on a pre-arrest detention when officers have probable cause to arrest an individual. Rather, "reasonableness" remains the Fourth Amendment touchstone for evaluating the conduct of the police officers who seize a person. <u>See, e.g., Mimms</u>, 434 U.S. at 108–09. Here, the officers had probable cause to believe Morgan had just committed two felonies and seized Morgan for 75 minutes to investigate, during which time Morgan either sat in her car or stood comfortably by the side of the road. During the investigation, Morgan confessed to possessing cocaine. Officer Dieckmann then drove Morgan to the police station. After Morgan waived her <u>Miranda</u> rights, Officer Dieckmann and Agent McKenna then interviewed Morgan at the police station. Morgan agreed to cooperate and did cooperate. Morgan then went home early in the morning on June 4, 2013, and the officers did not charge her or arrest her on June 3 or 4, 2013. The 75-minute seizure did not violate the Fourth Amendment, and the police did not violate either <u>McLaughlin</u> or <u>Gerstein</u>.

### III.

Morgan argues that all statements she made to law enforcement on and after June 3, 2013, were involuntary under the Fifth Amendment. Thus, she asks the court to suppress them.

"No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. A statement is an involuntary, compelled statement under the Fifth Amendment "only if it is involuntary within the meaning of the Due Process Clause." <u>United States v. Braxton</u>, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). A statement is involuntary under the Due Process Clause if the declarant's will was "overborne or [her] capacity for self-determination critically impaired" by

17

government conduct. United States v. Umana, 750 F.3d 320, 345 (4th Cir. 2014) (quotation omitted); Braxton, 112 F.3d at 780. "The voluntariness of a statement is to be determined from the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987). The government has the burden of proving voluntariness by a preponderance of the evidence. See, e.g., Lego v. Twomey, 404 U.S. 477, 489 (1972).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause . . . ." Colorado v. Connelly, 479 U.S. 157, 167 (1986). Police officers act coercively if they extract a confession through harm, threats of harm, deprivation of basic human necessities, extremely lengthy periods of interrogation or isolation, or substantial impermissible deception. See, e.g., United States v. Elie, 111 F.3d 1135, 1143 (4th Cir. 1997) (collecting cases), abrogated on other grounds by United States v. Sterling, 283 F.3d 216 (4th Cir. 2002). A court must review each statement under the totality of the circumstances and determine whether the statement was voluntary or was obtained by coercion or improper inducement. See, e.g., Haynes v. Washington, 373 U.S. 503, 513–14 (1963).

Although deceit may in some cases render a statement involuntary, police may engage in some misrepresentation without rendering a suspect's resulting confession involuntary. Braxton, 112 F.3d at 783; see Johnson v. Harkleroad, 104 F. App'x 858, 865 n.3 (4th Cir. 2004) (per curiam) (unpublished). For example, courts have upheld confessions as voluntary even when police misrepresented that a co-conspirator had already confessed, Frazier v. Cupp, 349 U.S. 731, 739 (1969), that a defendant's fingerprints had been found at the crime scene, Lucero v. Kerby, 133 F.3d 1299, 1310–11 (10th Cir. 1998), and that a witness had identified the individual as the perpetrator. See Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994).

18

Some broken promises, but not all, may render a subsequent statement involuntary. In analyzing whether a broken promise rendered a statement involuntary, the court views the evidence from the defendant's perspective. See, e.g., United States v. Shears, 762 F.2d 379, 402 (4th Cir. 1985). A police officer's promise "not to arrest and charge [a defendant] that day," even if broken, does not necessarily render a confession involuntary. See id. at 402 n.4; United States v. Robinson, 698 F.2d 448, 455 (D.C. Cir. 1983) (per curiam). Broad, general statements of cooperation, leniency, or non-prosecution also do not render a confession involuntary. See Umana, 750 F.3d at 345 (statement was not involuntary after ten comments over the course of a two-and-one-half hour interview that statements would not "cost" or "affect" the defendant); United States v. Whitfield, 695 F.3d 288, 303 n.8 (4th Cir. 2012) (statement was not involuntary when police told the defendant that the statements "would do 'nothing but help'" him (alteration omitted)); Rose v. Lee, 252 F.3d 676, 686 (4th Cir. 2001) ("[T]he cryptic promise that 'things would go easier' on [the defendant] if he confessed" did not render the statement involuntary.). Nonetheless, outright "promises of leniency or a plea bargain," if not kept, may render a resulting statement involuntary. See Shears, 762 F.2d at 402 & n.5. "Truthful statements [by police] about [a defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." Braxton, 112 F.3d at 782 (alterations and quotation omitted). Although Miranda warnings do not "dispense with the voluntariness inquiry, cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." United States v. Walker, 607 F. App'x 247, 255 (4th Cir. 2015) (unpublished) (alterations and quotations omitted) (quoting Dickerson v. United States, 530 U.S. 428, 444 (2000)).

Considering the totality of the circumstances and viewing the evidence from Morgan's perspective, Morgan's roadside statements to Officer Dieckmann that she had cocaine, had poured

19

the cocaine into a water bottle, and had swallowed the plastic baggie that previously contained the cocaine were voluntary and not the result of governmental coercion that overbore Morgan's will. When Morgan made those statements to Officer Dieckmann, Morgan was seized for purposes of the Fourth Amendment, but Morgan's seizure did not constitute a custodial arrest, she was not subjected to a custodial interrogation, and her seizure was legal. See, e.g., Atwater, 532 U.S. at 354–44; Whren, 517 U.S. at 818; Berkemer v. McCarty, 468 U.S. 420, 439–40 & n.29 (1984); Figg, 312 F.3d at 637; cf. Brown v. Illinois, 422 U.S. 590, 602–03 (1975) (confessions obtained after unlawful arrest are involuntary unless the taint of the unlawful arrest has been sufficiently purged by intervening causes). Morgan had been seized for approximately 74 minutes when she first confessed. During those 74 minutes, Morgan was allowed to sit in her car or stand by the side of the road, where she did not appear nervous and comfortably spoke with Officer Dieckmann about her own situation and personal matters. When Morgan confessed, Morgan had not been handcuffed, physically restrained, physically harmed, or threatened in any way. Officer Dieckmann's statement to Morgan at 8:26 pm that "we ain't taking you to jail for nothing," accompanied by an implication that Morgan might go to jail if drugs were found, was a permissible "[t]ruthful statement about the defendant's predicament" and did not render Morgan's confession involuntary. See Braxton, 112 F.3d at 782 (alteration and quotation omitted); Pelton, 835 F.2d at 1071–74. Furthermore, the officers' conduct leading to the Morgan's confession did not override Morgan's will. When Morgan confessed to Officer Dieckmann at 8:33 pm, the confession was voluntary.

In opposition, Morgan argues that Officer Dieckmann was kind to her and that Officer Dieckmann's kindness and prior social relationship with Morgan contributed to making Morgan's statements involuntary. In support, Morgan cites statements like "you know me, girl" and "I'm just trying to help you" and argues that these statements overbore Morgan's will.

Police officers are not required to behave in a hostile manner towards a suspect. Rather, police officers may use various investigative techniques, including appeals to personal relationships and friendly sentiments, when questioning a suspect. See, e.g., Pelton, 835 F.2d at 1072–74. Thus, the argument fails.

Morgan also argues that her statements were involuntary because the officers misled Morgan as to the reason for the traffic stop and falsely told her that a drug-sniffing dog was en route. The court rejects the argument. First, it is difficult to reconcile Morgan's argument that the officers misled her to believe she was detained for reasons unrelated to drugs, but also told Morgan that they had requested a drug-sniffing dog. In any event, the dashboard video recording of the traffic stop confirms that the officers made clear to Morgan early on in the stop that they were concerned that illegal drugs were in her car or had been thrown out of her car. Moreover, just before Morgan confessed to possessing cocaine, Officer Dieckmann falsely told Morgan that a drug-sniffing dog was en route, told Morgan that she would not go to jail if the dog found no evidence of drugs, and asked Morgan whether someone else might have left drugs in the car. Morgan then confessed. When Morgan confessed, Morgan understood that the true purpose of the officers' investigation concerned drugs, which is why she knew to confess to possessing drugs. Even if Morgan had persisted in believing that she was detained for a traffic-related reason, she does not explain how that misunderstanding amounted to coercion that overbore her will and caused her involuntarily to confess to possessing cocaine. If anything, believing that she was involved in a traffic stop would make her less likely to confess to possessing cocaine. As for Office Dieckmann's false statement that a drug-sniffing dog was en route, police may misrepresent the existence of incriminating evidence or investigative techniques without rendering subsequent confessions involuntary. See, e.g., Frazier, 394 U.S. at 739; Harkleroad, 104 F. App'x at 865 & n.3; Lucero, 133 F.3d at 1310–11;

Ledbetter, 35 F.3d at 1070. Thus, the officers did not violate the Fifth Amendment, and the court denies Morgan's motion to suppress her roadside statements on June 3, 2013.

Morgan also seeks to suppress any statements Morgan made in Officer Dieckmann's police car on June 3, 2013, before Morgan waived her Miranda rights at the police station. "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." Rhode Island v. Innis, 446 U.S. 291, 300 (1980). Although Morgan was in custody in the police car, Morgan spoke on her own initiative and not in response to any official inducement. Officer Dieckmann's words and conduct were not designed to elicit a response. Indeed, Officer Dieckmann had told Morgan that it was too difficult to hear and that the two should only talk once they reached the station. Therefore, Morgan's statements in Officer Dieckmann's police car on June 3, 2013, were knowing and voluntary.

Morgan also seeks to suppress statements that she made to the police on June 3 and June 4, 2013, at the police station after waiving her Miranda rights. The court, however, credits the uncontradicted testimony of Agent McKenna and Officer Dieckmann that, after arriving at the station on June 3, 2013, Morgan was read and waived her Miranda rights before she was debriefed. Morgan then made several incriminating statements and agreed to cooperate against Walters. Morgan's statements at the police station on June 3, and June 4, 2013, were knowing and voluntary. See, e.g., Moran v. Burbine, 475 U.S. 412, 421–24 (1986); Walker, 607 F. App'x at 255.

Finally, Morgan seeks to suppress statements that she made to the police after June 4, 2013, during the six months in which she actively cooperated as a confidential informant. These statements also were knowing and voluntary. See, e.g., Oregon v. Mathiason, 429 U.S. 492, 494–96 (1977) (per curiam). Thus, the court denies Morgan's motion to suppress statements she made to the police after June 4, 2013.

22

IV.

In sum, Morgan's motion to suppress evidence [D.E. 22] is DENIED

SO ORDERED. This 19 day of December 2016.

JAMES C. DEVER III
Chief United States District Judge